# CASES

## DECIDED IN THE

# SUPREME COURT OF GEORGIA

### AT THE

## MARCH TERM, 1922.

---

MATHIS *v.* THE STATE.

1. The evidence was sufficient to authorize the verdict.
2. "Alibi, as a defense, involves the impossibility of the prisoner's presence at the scene of the offense at the time of its commission; and the range of the evidence in respect to time and place must be such as reasonably to exclude the possibility of presence." The evidence, construed most favorably for the defendant, did not reasonably exclude the possibility of the presence of the defendant at the scene of the homicide, and therefore it was not error to fail to charge the law of alibi.
3. The court did not err in refusing a new trial.

No. 2713. MARCH 17, 1922.

Indictment for murder. Before Judge Wright. Chattooga superior court. June 11, 1921.

*Porter & Mebane,* for plaintiff in error.

*George M. Napier, attorney-general, E. S. Taylor, solicitor-general, Seward M. Smith, asst. atty.-gen.,* and *J. F. Kelly,* contra.

HILL, J. Clint Mathis was indicted for the murder of Lewis E. Kinsey, and on the trial of the case a verdict was rendered finding the defendant guilty with a recommendation to mercy; and he was sentenced to life imprisonment in the penitentiary. The defendant filed a motion for new trial, which was overruled, and he excepted. The case is here, the plaintiff in error assigning error on two grounds. The original motion sets forth that the verdict is contrary to law, contrary to evidence, and without evidence to support it. The only question raised by the amendment to the motion for a new trial is on the failure of the court to charge the

jury the law of alibi. We will consider first the usual general grounds raising the question as to whether the verdict is supported by the evidence.

1. The evidence in the case as made by the State and the defendant, whose sole defense was alibi, is substantially as follows: The deceased was a rural mail carrier in the county of Chattooga, and carried mail from Summerville along his route and returned in the afternoon of the same day. He was 49 years of age. On January 27, 1921, after carrying the mail and returning late in the afternoon he disappeared and his whereabouts were unknown until the 12th day of March, 1921, a period of forty-four days. On the last-named date his body was found in the woods within twenty yards of a public road and within about 120 yards of a public schoolhouse, three or four miles from Summerville. From the disappearance of the deceased until the day his body was found numbers of people had constantly passed along the road where the body was found, and a number of school children had played within a short distance of where the body was found, without discovering it and without detecting any odor from the body. There was a dwelling-house near where the body was found, and the inmates of the dwelling-house testified that they had never detected any odor as from a decomposed body, nor had they seen indications of vultures circling over or around the body. The body was first discovered by a Mr. Norton on March 12, 1921, after the woods had been burned off and the fire had burned the leaves and broom-sedge and some of the tree tops which surrounded the body, thus exposing it partially to view. In the early part of the night of January 27 the defendant was at his sister's, a short distance from where the body was found. The deceased had carried the mail on that route. The defendant had been indicted by the grand jury of Chattooga county in six misdemeanor cases, and was hiding from the arresting officers of the law. The deceased knew of this fact; and on January 27, while delivering mail along his route, he made an engagement to meet the defendant in the road at the mail box at the home of his sister, for the purpose of taking the defendant to Rome in his automobile. In addition to carrying the mail, the deceased used his car for carrying passengers after his day's work was done. On the day of his disappearance the deceased had finished carrying his mail; and after going to

his home and also to the railroad station at Summerville to meet a train, he met the defendant at the appointed place and took him into his car. Several witnesses testified to meeting the deceased in his Ford car, which they recognized, going toward the home of the sister of the defendant. In fact the defendant admitted that the deceased came to his sister's home about six o'clock p. m., and took him in his automobile to Rome. The spot where the body of the deceased was found was about a mile and a half from where the sister of the defendant lived, and where he was taken into the car. The wife of the deceased testified that when he left home he had five or six dollars in money in his pocket, and when his body was discovered he had six cents in his pocket, besides other articles which were identified as belonging to him. A witness for the State testified that on the night of January 27, about six o'clock, he heard six shots fired in the direction of the schoolhouse from where he lived. The body of the deceased was found about a quarter of a mile from where this witness, John Dodd, lived. He also testified that the six shots were heard about fifteen or twenty minutes after the automobile had passed his house, going in the direction of the schoolhouse. When the body was found in a badly decomposed state, a metal tag was found in the pocket of the deceased, which corresponded to the license number of the Ford car which belonged to him, which automobile was found in Chattanooga, Tennessee, a few days later, and identified by the son of the deceased as that of his father.

Two witnesses, who were employees of the terminal station company in Chattanooga, testified that the Ford car which was later identified as belonging to the deceased was driven up to a point near the station at about three o'clock a. m., on the morning after the disappearance of the deceased, by the defendant, and was parked at or near the curb. The car was abandoned by the defendant and it remained where it was left by him for two or three days until it was taken possession of by the chief of police of Chattanooga and by him restored to the family of the deceased. The witnesses recognized and identified the defendant on the trial as being the man who drove the car into Chattanooga and left it in front of the terminal station. The ticket-agent sold a ticket to a man who fitted the description of the defendant, between three and four o'clock a. m, on the morning of the 28th of January, to Asheville,

N. C., and the purchaser of the ticket hurried to catch the 4:15 a. m. train on that day for Asheville. Shortly thereafter the defendant was arrested by the chief of police in Marion, N. C., in a "crap game;" and he gave his name as Henry Martin. While he was incarcerated in the jail in Marion, the chief of police brought to the jail a card advertising and offering a reward for the defendant, Clint Mathis, and showed the card to the defendant, who admitted that he was not Henry Martin but was Clint Mathis. The defendant was brought from Marion, N. C., and placed in the jail of Fulton county, Georgia, where he was identified by one of the employees of the terminal station in Chattanooga, as being the man who drove the Ford car into Chattanooga and left it in front of the terminal station. Near where the body of the deceased was found automobile tracks were found in the woods. The tracks had the appearance of having been made some weeks prior to the time they were seen. Several thirty-eight caliber pistol shells were also found near where the body of the deceased was found, the shells looking comparatively new. When the defendant was arrested in Marion, N. C., the chief of police took from the defendant a Smith & Wesson improved pistol of thirty-eight caliber. Two doctors who examined the body of the deceased after it was found testified that the deceased had on his person several pistol-shot wounds; one of the doctors stating that he thought the wounds were produced by a thirty-eight caliber pistol, and the other that he thought they were produced by a forty-four caliber, but that they could have been produced by a thirty-eight caliber. They also testified that the head of the deceased was entirely gone, and only a part of the skull remained; and that the skull had been crushed with some heavy instrument which would have produced death.

The ex-sheriff of Chattooga county, who went to Marion, N. C., for Clint Mathis, testified that at first the defendant said he did not know anything about Kinsey, the deceased, and the witness informed the defendant that he had some information before he left home that he imparted to the defendant; and then the defendant told the witness and those who were with him that Kinsey did go down to his sister's after him and carried him to Rome and left him on Broad street, and that he got on the street-car and went to Lindale, and that was the last he ever saw of Kinsey. Witness asked the defendant what time that was, and he said it

was ten o'clock. Then the witness told the defendant about a letter that he had read from the defendant, and the defendant said, " Well, I did see him after I came back from Lindale." ·The witness asked, " If you saw him when you came back from Lindale, then what time was it when you left him ? " The defendant replied, " It was twelve o'clock." Defendant had stated to the witness previously that he did not go to Marion by Chattanooga, but went by Atlanta; and the witness said, " You could not have gone by Atlanta and got to Marion at the time you got to Marion," and " You know you did not go to Atlanta," and the defendant said, " No, I did not go by Atlanta, I went to Chattanooga." Defendant also told this witness that he went to Chattanooga " in a Buick-Six with a negro." He also said that the negro did not charge him anything, and said that Kinsey charged him ten dollars for bringing him to Rome. He said that he had never been to North Carolina before, and that he took the first train going out of Chattanooga. He also told this witness, in his first statement to him, that he went to Rome with a man by the name of Robinson, and that he went to Atlanta on the train from Rome, and that he never did see Lewis Kinsey that night; and after witness told him that he knew he went to Chattanooga, he said that he did. In his conversation the defendant also said that he got to Chattanooga about 3 o'clock, that he left there at 4:15, and that he went to Chattanooga by Summerville. The defendant also wrote a letter from Asheville, N. C., on January 28, addressed to Miss Lona Wilson, at Lindale, in which he stated that he had gone from Rome to Atlanta. A witness for the State, Lester Norton, testified that Kinsey, about two weeks before his disappearance on January 27, came along the road in his car carrying the mail, and the defendant said, referring to the deceased, " he has it in for me because I beat him out of his woman once."

The foregoing evidence is circumstantial only, but we are of the opinion that it is sufficient to exclude every other reasonable hypothesis save that of the guilt of the accused.

2. The sole defense of the defendant upon the trial of the case was that of alibi. In the only special ground of the motion for new trial the plaintiff in error complains that the court failed to charge the jury on the law of alibi. Section 1018 of the Penal Code of 1910 provides: " Alibi, as a defense, involves the impossibility of

the prisoner's presence at the scene of the offense at the time of its commission; and the range of the evidence, in respect to time and place, must be such as reasonably to exclude the possibility of presence." On the trial of the case the defendant offered as a witness Miss Lona Wilson of Lindale, who testified that the defendant came to her sister's house, where she was living, on January 27, which was Thursday night. "He came in and told me he was going away; said he was going somewhere to get him a job to go to work, and he asked me to loan him some money, and I let him have $40, and he said as soon as he got work he would send it back to me. I says, 'Where are you going?' and he says he thought he was going to Atlanta from there, but did not know where he would go from Atlanta. Said though he was going to stop at the first place he could get a job, and that when he stopped he would write to me. On Sunday I received a letter from him, and he was in Asheville, N. C., where he wrote the letter. This is the letter already introduced in evidence by the State. . . Clint got to Lindale that night about 8 o'clock by his watch. He stayed there something like two hours, and he looked at his watch a few minutes before he left. I have traveled over the car line from Rome to Lindale many, many times. It takes from thirty to forty-five minutes to go on the street car from Rome to Lindale. It takes about ten minutes to walk from the car line to where I live. . .. He told me then that Mr. Robinson brought him to Rome, and that he came out to Lindale on the car, and was going . back to Mr. Robinson and go on to Atlanta with Robinson. Lindale is five miles from Rome."

In his statement to the jury the defendant said, among other things, "On the 27th day of last January I met Mr. Kinsey on his mail route, and I made arrangements with him to carry me to Rome, Georgia, that night, and that night at six o'clock he met me at the place where we agreed to meet at Mr. Dodd's mail-box, and I got in his car and he drove me to Rome; and he knew the reason I wanted to go to Rome; he knew that I was in some trouble here; the grand jury had returned six true bills against me for misdemeanors at the last term, and he knew that, and he knew that was the reason I wanted to go; and the reason I asked him to carry me was he was my friend, and I knew he would carry me and nobody would know it, and he would not tell it. He drove me to

Rome, and I left him on Broad street; and he knew I did not have any money, and I told him to wait there in Rome till I went to Lindale and got some money and came back. He kept my suit-case in the car, and he was there when I got back, and he was talking to some man there on the street; the man was in a Buick-Six automobile, standing right by Mr. Kinsey; and just as I walked up I overheard this man say he was going to Chattanooga, and I was intending to wait till the next morning and go to Atlanta and go to North Carolina. Mr. Kinsey knew that I was going to North Carolina. After hearing this man say he was going to Chattanooga I asked him if I could go along with him, and he says I sure could, that he was glad to have my company, as he was by himself; and this man drove me to Chattanooga, and I got out of his car directly in front of the terminal station. I walked in and set my suit-case down and bought a ticket to Asheville, N. C., and went in the train at 4:15, and got to Asheville the next day around or about one o'clock. I stayed in Asheville from one o'clock until the next day at two. I caught the train then at two o'clock in Asheville the next day, and went to Marion, N. C. There is where I was arrested in a crap game," etc.

The above is substantially all the evidence relating to the question of alibi. We are of the opinion that this evidence is not such as reasonably to exclude the possibility of the presence of the defendant at the scene of the homicide. It was also in evidence that the distance from the place where the body of the deceased was found to Rome is about twenty-four miles; and assuming that the homicide occurred at or about six o'clock, when the six shots were heard to come from the direction in which the body was found, we can not say that the appearance of the defendant in Lindale, which is approximately twenty-nine miles away, at eight o'clock, would reasonably exclude the possibility of the presence of the defendant at the scene of the homicide. Besides, there is positive evidence in the record to show that the distance between where the body of the deceased was found and Rome could be made within an hour or an hour and fifteen minutes.

From what has been said above we conclude that the evidence, construed most favorably for the defendant, did not exclude the possibility of the presence of the defendant at the scene of the

homicide; and therefore the presiding judge did not err in failing to charge the jury on the subject of alibi.

3. The court did not err in overruling the motion for new trial.

*Judgment affirmed. All the Justices concur, except Fish, C. J., absent because of sickness.*